**HEALTH COMMUNICATIONS, INC., Appellant**

v.

**MARINER CORPORATION.**

**No. 87–7230.**

United States Court of Appeals, District of Columbia Circuit.

Nov. 1, 1988.

Marc E. Chafetz, Washington, D.C., was on the brief, for appellant.

Jack L. Gould, Fairfax, Va., was on the brief, for appellee.

Before EDWARDS, WILLIAMS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Appellant Health Communications, Inc. (HCI), is a corporation chartered by and located in the District of Columbia, from which it operates a program to train servers and sellers of alcohol in order to prevent alcohol abuse. Appellee Mariner Corporation is a hotel management firm that has its principal place of business in Texas, and has no operations in the District of Columbia. HCI filed a complaint against Mariner in the District Court for the District of Columbia, alleging that it provided services to Mariner for which it had not been paid. The district court dismissed the complaint for want of personal jurisdiction over Mariner, on the ground that the company did not have the minimum degree of contact with the District required to make it amenable to suit here as a matter of due process. We affirm.

## I. BACKGROUND

From its office in the District of Columbia, HCI markets and administers a program called "Training for Prevention Procedures for Servers of Alcohol" (which it refers to as TIPS), designed to train employees who serve alcohol to recognize alcohol abusers. TIPS has apparently developed a national reputation for high quality training, and some liability insurers offer special rates to firms whose employees have gone through the program.

Mariner operates hotels in five states but has no business operations in the District. In 1986, Mariner contacted HCI about the possibility of its employees receiving TIPS training. Over the next eight months, HCI and Mariner officials had several telephone conversations and exchanged correspondence, leading to a contract for HCI to conduct a TIPS workshop for some Mariner employees. The contract was signed in Texas; it did not make any provision concerning either the parties' choice of law or Mariner's consent to the District of Columbia as a forum for suit.

In performance of this contract, and a further agreement to like effect, HCI held four two-day workshop sessions "at various locations throughout the United States," none of them in the District. At these sessions, 36 Mariner employees took an examination that HCI graded at its office in the District; HCI then sent to each employee who had passed the examination a certificate authorizing that employee to train other Mariner employees ("servers") in approved TIPS methods for a period of one year (after which they could be recertified).

The Mariner employees certified as TIPS trainers were required, in training sessions for servers, to follow procedures outlined in manuals obtained from HCI's office in the District of Columbia; as with the trainers, HCI graded the examination papers of Mariner servers at its office in the District and from there issued certificates to those who had passed. HCI also sent Mariner periodic reports listing all Mariner employees who had received TIPS training, and sent Mariner trainers a quarterly newsletter and other communications, all originating from the District of Columbia.

462

In its complaint, HCI alleged that Mariner had failed to pay for these services pursuant to their contract. Mariner responded that it lacked the "minimum contacts" with the District of Columbia necessary for the district court here to assert personal jurisdiction over it. That court agreed, concluding that "[t]he few acts described above which actually [were] performed within the District of Columbia by HCI ... [were] mainly ministerial and administrative tasks" incidental to the business relationship between the parties.

On appeal, HCI claims that the district court's dismissal of its complaint is inconsistent with the Supreme Court's "minimum contacts" analysis in *Burger King v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1984). In that case, the Court upheld plaintiff Burger King's assertion that the district court in Florida, where the company was headquartered, had personal jurisdiction over an out-of-state defendant who had contracted within the forum for a fast food franchise to be located out-of-state. HCI asserts that Mariner, similarly, by contacting HCI and entering into a contract for its TIPS program, entered into an ongoing relationship with HCI in the District of Columbia sufficient to constitute the "minimum contacts" necessary for the district court here to assert personal jurisdiction over Mariner.

## II. ANALYSIS

Due process requires that, for a court to assert personal jurisdiction over a defendant not physically present within the forum, the defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940). As the Court has recently restated this proposition, the defendant's contacts with the forum state must be such that it "should reasonably anticipate being haled into court" there. *World–Wide Volkswagen Corp. v. Wood-*

*son,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). Thus, a publisher that "purposefully directed" its magazine to the forum state, and "continuously and deliberately exploited the [forum state] market ... must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine." *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 781, 104 S.Ct. 1473, 1478, 1481, 79 L.Ed.2d 790 (1980). In such circumstances, the publisher has met the requirement "essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

### A. The Burger King Analysis

In *Burger King,* the Court specifically addressed the question of whether and to what extent a contract can constitute a "contact" for purposes of due process analysis. The Court rejected the proposition that an "individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum." 471 U.S. at 478, 105 S.Ct. at 2185 (emphasis in original). Instead, it stressed the need for a realistic approach that takes account of certain specific "factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." 471 U.S. at 479, 105 S.Ct. at 2185.

In the light shed by *Burger King,* one can distinguish two clear principles: (1) an intimate relationship between contract parties, such as the relationship between franchisor and franchisee that the Court described in *Burger King,* may inherently bring the franchisee into the necessary degree of contact with the forum where the franchisor's home office is located; but (2) the "'purposeful availment' requirement [of *Hanson*] insures that a defendant will

not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, ... or of the 'unilateral activity of another party or a third person.'" 471 U.S. at 475, 105 S.Ct. at 2183 (citations omitted). To illustrate the latter principle, the Court instanced the case of the "out-of-state automobile distributor whose only tie to the forum resulted from a customer's decision to drive there." *Id.* at 475 n. 17, 105 S.Ct. at 2183 n. 17.

For contacts that fall between these two antipodes—where the course of dealing is not as intensive and extensive as in the franchise relationship in *Burger King* itself, nor as fortuitously and unilaterally related to the disputed forum as in the case of the hapless automobile dealer—*Burger King* provides only limited guidance to the lower courts; we are remitted to determining "whether the defendant purposefully established 'minimum contacts' in the forum State," *id.* at 474, 105 S.Ct. at 2183, such that "he should reasonably anticipate being haled into court there." *Id.*, quoting *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567.

Nonetheless, we have guidance sufficient for the resolution of this case; for if Mariner's customer relationship with HCI subjects it to the personal jurisdiction of a court in the District of Columbia, then it is hard to imagine that anyone entering into a contract for the provision of goods or services by an out-of-state party could avoid being haled into court in the seller's forum. This the Court in *Burger King* clearly did not intend.

### B. *Application*

■ HCI maintains that the services considered "incidental" and "ministerial" by the district court are, in fact, integral to "[t]he sole reason anyone would seek TIPS training" over other programs for alcohol sellers, *viz.* its maintenance of a high standard of quality through ongoing monitoring "from this jurisdiction." HCI would thus have us understand its provision of these quality control measures as being closely analogous to the franchise relationship in *Burger King.*

As we read the Supreme Court's account, however, the business relationship in *Burger King* was markedly different from that between HCI and Mariner. Burger King's franchisee received "a comprehensive restaurant format and operating system for the sale of uniform and quality food products." In addition to paying a substantial fee therefor, it "agree[d] to submit to the [franchisor's] exacting regulation of virtually every conceivable aspect of [its] operations." 471 U.S. at 464, 465, 105 S.Ct. at 2177, 2178. The franchisor, from its offices in the forum state, established the range, appearance, size, and taste of items on the franchisee's menu; it mandated particular hours of operation, restaurant operating standards, and building layouts, as well as accounting and insurance requirements. *Id.* at 465 n. 4, 105 S.Ct. at 2178 n. 4. The franchisee participated in a mandatory management training program held in the forum state, *id.* at 465 n. 2, 105 S.Ct. at 2178 n. 2, and submitted expressly and willingly to the law of that state in its contract with the franchisor. *Id.* at 466, 105 S.Ct. at 2178.

In effect, the franchise agreement in *Burger King* accomplished a virtual integration of the parties' businesses. While the out-of-state franchisee owned its Burger King restaurant, that restaurant lacked any identity apart from that of the Burger King chain, which gave the business its value and defined its character. The franchise was, in reality, a mere outpost of Burger King's empire, centrally controlled from the franchisor's home office in the forum state. Thus, the Supreme Court had no difficulty concluding that the franchisee had the necessary degree of contact with the jurisdiction from which is was ruled.

By contrast, Mariner's relationship with HCI is narrowly specialized. Mariner purchased from HCI some alcohol training services and the right for those employees trained directly by HCI to pass along the information contained in the TIPS program to other Mariner employees, aided by HCI's examination-scoring facility in the District of Columbia. Put most extravagantly, HCI's office in the District exercises indirect control over the conduct, by Mariner trainees, of TIPS training sessions for Mar-

iner's servers of alcohol. By no stretch of the imagination does this control extend to or even affect, much less define, the character of Mariner's business, as did the franchise agreement in *Burger King.*

Indeed, this arrangement is indistinguishable from the everyday purchase of goods supported by continuing services from the seller. For example, a business might purchase a computer along with a promise by the seller to train the purchaser's employees, at the purchaser's premises, in its use; trainees could then pass along to others within the firm the skills and information they had received, subject to monitoring by the seller to assure customer satisfaction. As we read *Burger King,* a contract for such a purchase, standing alone, would not support the assertion of personal jurisdiction over the buyer in the seller's home state, because it does not entail the buyer's "purposefully establish[ing] 'minimum contacts' in the forum," 471 U.S. at 474, 105 S.Ct. at 2183, or "purposefully avail[ing] itself of the privilege of conducting activities within the forum State." 471 U.S. at 475, 105 S.Ct. at 2183, quoting *Hanson,* 357 U.S. at 253, 78 S.Ct. at 1239.[1]

Here, the acts HCI performed in the District of Columbia on behalf of Mariner do not begin to approach, in either scope or importance, those that Burger King performed in Florida on behalf of its out-of-state franchisee. The operation of the franchisee's business was subject to detailed direction from Burger King's office in the forum state, pursuant to the franchise agreement. While Mariner obviously wanted, and expected to benefit from, HCI's training services, we can hardly conclude that HCI's examination-scoring and certification services performed in the District of Columbia were integral to Mariner's hotel management operations. Since no other aspect of Mariner's business touched the District in any way, we cannot say that Mariner has "avail[ed] itself of the privilege of conducting activities within the forum." *Hanson,* 357 U.S. at 253, 78 S.Ct. at 1240.[2]

Finally, in support of the assertion of personal jurisdiction, HCI fixes upon a single passage in *Burger King,* where the Court noted that the defendant franchisee had "eschew[ed] the option of operating an independent local enterprise" and had instead "deliberately 'reach[ed] out'" beyond its home state "for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." 471 U.S. at 479–80, 105 S.Ct. at 2186. Ignoring the fact that in this case Mariner did not eschew the option of operating an independent local enterprise, HCI observes that Mariner did "reach out" to the District of Columbia in order to obtain the TIPS program, in the sense that it could have purchased "similar" alcohol training programs from vendors in Texas. As HCI put it: "What was not available to the defendant—except from Washington, D.C.—were the unique services only provided by HCI. For this reason, Mariner 'reached out' to this jurisdiction...."

Appellant seems to confuse a distant purchaser "reaching out" to a seller in the forum state with a seller "reaching out" to a distant state in order to do business there. At least if it circulates its wares there, the seller purposefully avails

---

1. Appellants point to *Pedi Bares, Inc. v. P & C Food Markets, Inc.,* 567 F.2d 933 (10th Cir.1977), upholding personal jurisdiction over an out-of-state buyer that had purchased goods manufactured in, and shipped from, the forum state and had sent partial payment to the seller in that state. In doing so, *Pedi Bares* upheld application of a Kansas long-arm statute authorizing, in the court's words, "the exercise of personal jurisdiction over a nonresident when the sole basis is a contract with a resident to be performed in Kansas." 567 F.2d at 935. We view *Pedi Bares* as inconsistent with the Supreme Court's subsequent analysis of minimum contacts in *Burger King* and, therefore, decline to follow it.

2. We note also that the HCI–Mariner contract does not specify any choice of governing law nor provide for consent to suit in the District. While such provisions are clearly not dispositive under *Burger King,* their presence can be indicative of the parties' own perceptions of their degree of contact with a particular forum. At the least, the parties' express understanding, if any, is relevant to the ultimate question of whether the defendant "should reasonably anticipate being haled into court" in the jurisdiction specified in the agreement.

itself of forum state law. *Keeton,* 465 U.S. at 781, 104 S.Ct. at 1481. By contrast, a purchaser who selects an out-of-state seller's goods or services based on their economic merit does not thereby purposefully avail itself of the seller's state law, and does not merely by purchasing from the seller submit to the laws of the jurisdiction in which the seller is located or from which it ships merchandise. Of course, a seller suing in its home state might argue that an out-of-state buyer has availed itself of that forum's laws in the sense that the buyer typically could have sued the seller in the forum state for breach of contract had the need arisen. In light of *Burger King,* however, this contingent type of "contact" is plainly not enough, as it would alone and automatically extend personal jurisdiction over all buyers in interstate contract actions, without regard to the parties' actual course of dealing and its relation to the forum.

### III. CONCLUSION

We conclude that Mariner lacked the minimum contacts with the District of Columbia necessary for the district court to assert personal jurisdiction over it. Accordingly, the order of the district court dismissing HCI's complaint is

AFFIRMED.