**AMERICA ONLINE, INC., and ICQ, Inc., Plaintiffs,**

v.

**Chih–Hsien HUANG, et al., Defendants.**

No. Civ. 00–290–A.

United States District Court, E.D. Virginia, Alexandria Division.

July 13, 2000.

Michael A. Grow, James R. Davis, II, Arent Fox Kintner Plotkin & Kahn, Washington, DC, for plaintiffs.

John W. Polk, Kenneth R. Hayduk, Baker & McKenzie Washington, DC, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

A threshold question presented in this trademark and trade name dispute is whether personal jurisdiction over a defendant exists based on the defendant's registration of the allegedly infringing domain name with a registrar located in the forum state. More specifically, the question is whether a California defendant who used the Internet to register an allegedly infringing domain name with a domain name registrar located in Virginia is, on that basis alone, subject to suit to in Virginia arising from the registration of the domain name.

### I

Plaintiffs America Online, Inc. ("AOL"), and ICQ, Inc., a wholly-owned subsidiary of AOL, are Delaware corporations with a shared principal place of business in Dulles, Virginia. Defendant eAsia, Inc., the sole defendant to have been served at this point, is a California corporation, with its principal place of business in Taipei, Taiwan. Defendant Chih–Hsien Huang,

an individual, and defendant Inforia, Inc., a California corporation, have not yet been served. According to the complaint, defendant Inforia, Inc., doing business as Inforian Inc., is a subsidiary of Inforian Inc., a Taiwan corporation, which is itself a subsidiary of eAsia.

Plaintiffs offer a wide variety of online services, including services under their common law mark, "ICQ."[1] The ICQ service allows persons registered with the service to determine whether another person registered with the service is currently online. Thus, ICQ is clever shorthand for "I Seek You." Once two users realize they are online at the same time, they may exchange messages via email, engage in real time "chat," and exchange files with one another. In essence, the purpose of ICQ is to facilitate real time Internet communication and interaction.

eAsia, through its subsidiaries, develops Internet related software and provides Internet related services for customers in Taiwan and other parts of Asia. It is apparent from the record that eAsia directs its products and services primarily, if not exclusively, at Chinese-speaking regions of Asia. First, eAsia's web pages are written in Chinese, and any English or other western words on the pages are rare and used primarily as trademarks. And second, the undisputed affidavit of eAsia's president establishes that eAsia's products and services are aimed at, and marketed exclusively in, Asia.

Among the services eAsia offers is a communications protocol it refers to as ICQ. It is unclear on this record whether this service is similar to that offered by plaintiffs under the same mark. In any event, eAsia registered and used the allegedly infringing domain names <picq.com> and <picq.net>, and Inforia Inc., registered and used the allegedly infringing domain name <cicq.net>.[2] Both corporations registered the domain names with Network Solutions Incorporated ("NSI"), at the cost of approximately $35.00 per year. Significantly, the registration process occurred entirely online, by way of NSI's web site, and lasted no more than a few minutes.

Plaintiffs contend that the use of the ICQ mark on defendants' web pages, and defendants' registration and use of Internet domain names that incorporate the ICQ mark, infringed plaintiffs' rights to that mark. They have sued all three defendants under a variety of theories, including (i) violation of the recently enacted Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), (ii) false designation of origin and false advertising, 15 U.S.C. § 1125(a), (iii) dilution, 15 U.S.C. § 1125(c), (iv) common law unfair competition, (v) common law service mark infringement, (vi) common law trade name infringement, and (vii) violation of Virginia's Consumer Protection Act, Va.Code § 59.1–1–198. In the motion at bar, eAsia, the only served defendant thus far, seeks dismissal for lack of personal jurisdiction, or in the alternative, for lack of venue. Plaintiffs respond that eAsia is subject to personal jurisdiction in this case by virtue of its having registered the domain names <picq.com> and <picq.net> with NSI, which is located in Herndon, Virginia. As an additional factor, plaintiffs argue that personal jurisdiction is also appropriate because they are located in the forum state, and therefore the alleged harm was suffered here.

## II

Given that domain name registration is the basis relied on for jurisdiction, a useful starting point is discussion of domain names, and the role NSI plays with respect to domain names and the operation of the domain name system ("DNS"). Specifically, it is necessary to understand the essentially decentralized nature of the

---

1. Not reached here is the question whether ICQ is a valid trademark.

2. According to the record, eAsia and its affiliates no longer use these three domain names.

DNS, and the very limited, albeit essential, role that NSI's actions in Virginia play with respect to the operation of the DNS.

The history and structure of the Internet have been discussed by numerous courts, and need not be reiterated here.[3] In essence, the Internet is an international network of computer networks that communicate with one another through the use of a standard language or protocol.[4] At a high level of abstraction, the Internet is simply a medium by which computers or computer networks otherwise isolated from one another may interact. Thus, for the Internet to function, each computer connected to the Internet, known as a "host," must have a unique identity, so that other computers may identify it. Currently, a computer's identity on the Internet is its Internet Protocol address ("IP address"), a numerical address that "appear[s] as four numbers, each between 0 and 255, separated by periods." Goldfoot, *supra* note 4, at 913; *see Thomas*, 176 F.3d at 502–03 & n. 1 (discussing the structure of an IP address). Of course, it is difficult for individual users to remember, and hence use, long numerical addresses, a fact that led to the development of the DNS. In functional terms, the DNS allows a user to locate a particular computer on the Internet by using an alphanumeric "domain name," in lieu of the computer's IP address.[5]

Yet, a domain name does not replace the IP address. Instead, a domain name is an alphanumeric *means* of determining the appropriate IP address by way of the DNS. In essence, the DNS matches a domain name with the appropriate IP address. But this simple description incorrectly suggests that the DNS is a central database to which other computers may refer, when the DNS is instead a decentralized, albeit hierarchical, process for correlating a domain name with the appropriate IP address.[6] The hierarchical nature of the DNS is reflected in the structure of the "domain name space," at the top of which is the root, followed closely by the various Top Level Domains ("TLDs"), such as .com and .edu.[7] The decentralized

3. *See, e.g., Reno v. ACLU*, 521 U.S. 844, 849–53, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997); *Thomas v. Network Solutions, Inc.*, 176 F.3d 500, 504 (D.C.Cir.1999); *Network Solutions, Inc., v. Umbro Int'l, Inc.*, —— Va. ——, 529 S.E.2d 80, 82–83 (Va.2000).

4. *See* Josh A. Goldfoot, Note, Antitrust Implications of Internet Administration, 84 Va. L.Rev. 909, 910–18 (1998) (providing an explanation of the Internet's basic structure). The word "internetwork" or "internet" is a computer science term of art that refers to "a network formed by connecting two or more networks together." *Id.* at 910.

5. A domain name refers to a computer, and does not refer to a particular file, such as a web page. Instead, a particular file on the Internet, such as a web page, is identified by its Uniform Resource Locator ("URL"), which includes the domain name, identifies the file, and indicates the protocol required to access the file. For example, Roger Ebert's web page is located at the URL, <http://www.suntimes.com/ebert/index.html>, which URL communicates the following information: (i) "http" refers to "Hypertext Transfer Protocol," the language required to access the web page, (ii) "www.suntimes.com" is the domain name for the Chicago Sun Times, and refers to the web server of the Sun Times, (iii) "ebert" refers to a particular directory on that server, and (iv) "index.html" refers to a particular file in that directory.

6. *See Thomas*, 176 F.3d at 503–04; G. Peter Albert, Jr., Eminent Domain Names: The Struggle to Gain Control of the Internet Domain Name System, 16 J. Marshall J. Computer & Info.L. 781, 783 (1988).

7. At the very top of the hierarchy is the otherwise nameless "root," from which extend each of the various Top Level Domains ("TLDs"), from each of which extend a multitude of Second Level Domains ("SLDs"), and so on. *See* Paul Albitz & Cricket Liu, DNS and BIND § 2.1 (3d ed.1998), *available at* <http://www.oreilly.com/catalog/dns3/chapter/ch02.html> (discussing the domain name space). Thus, the domain name space is relational, rather than geographic, and has been described as "a large inverted tree," at the top of which is the root, and which extends downward through seemingly endless branches and subtrees. *See id.* Although each second level domain is a subdomain of its TLD, management of the second level domains are typically delegated to an entity other than the

nature of the DNS, on the other hand, is reflected in the way the DNS actually works. Specifically, there is no master directory of domain names and IP addresses to which a computer refers when confronted with an unknown domain name. Instead, the domain name database is distributed across the Internet, on a multitude of name servers, each responsible for correlating the IP addresses and domain names of computers within its particular "zone" of the domain name space.[8] The DNS is the means of searching that distributed database. The DNS, and the relatively limited, albeit essential role that registries such as NSI play in the DNS, is illustrated by its mechanics. When a person uses a domain name to identify a particular computer, that domain name is submitted to the user's DNS server. Unless the DNS server is familiar with that domain name, it must search beyond the user's network for the relevant information. The user's server first submits a query to one of over a dozen root name servers, which server then directs the query to the appropriate name server for the domain name's TLD. *See* Albitz & Liu,

*supra,* § 2.6.1.[9] After receiving the query from the user's name server, the TLD name server refers the query to a name server for the domain name's second level domain ("SLD")—a server which in most instances, including for the domain names at issue in this case, is not controlled by the entity that controls the TLD name server. Assuming the computer to which the domain name refers is in the zone of the SLD's name server, that server, not the TLD name server, provides the specific IP address of the computer the user seeks.

Thus, NSI and other entities with similar responsibilities have two essential functions: (i) a registrar function, to govern the distribution of SLDs, and to ensure each SLD within a particular TLD is unique,[10] and (ii) a registry function to correlate each SLD with the IP address of the SLD's name server, and make that information available to the DNS. *See Thomas,* 176 F.3d at 505. With respect to the registry function, NSI currently operates the name server for several TLDs, including the TLDs of the domain names

entity that manages the TLD. *See* Albitz and Liu, *supra,* § 2.3 (discussing delegation of domains). Thus, while the domain names jmu.edu and princeton.edu are subdomains of the TLD edu, they are nonetheless managed by James Madison University and Princeton University respectively. *See id.* In addition, a second level domain may have its own subdomains, which may in turn have their own subdomains, each of which falls within the umbrella of the domain immediately above it in the hierarchy. For example, the domain name vaed.uscourts.gov refers to the domain vaed.uscourts.gov, which is a subdomain of uscourts.gov, which is itself a subdomain of the TLD, .gov. *See, e.g., Network Solutions,* 529 S.E.2d at 83; Albitz & Liu, *supra,* § 2.1.2 n. 3 (discussing use of the term "subdomain"). The term farthest to the left in a domain name identifies a host computer within the domain, and is the hardware to which the domain name refers.

**8.** *See* Albitz & Liu, *supra,* § 2.4 (discussing zones); *see also* Albert, *supra,* at 783 (noting that "each name server only has the address information for computers in its zone"). Thus, the name servers located at James Madison

University and Princeton University include accurate databases of all IP addresses that fall within the zones, jmu.edu and princeton.edu, respectively.

There is a subtle, albeit significant, distinction between "zones" and "domains." A domain includes every subdomain that falls beneath it in the domain name space, so that the domain vaed.uscourts.gov is within the domain, uscourts.gov, which is within the TLD, .gov. *See* Albitz & Liu, *supra,* § 2.4. On the other hand, "zones" are distinct areas over which a particular entity has responsibility. Thus, the .edu "zone" is distinct from the jmu.edu "zone," even though the domain jmu.edu falls within the .edu TLD. *See id.*

**9.** In many instances, the root server is also an authoritative name server for the relevant TLD, in which case the first and second inquiries are combined. *See id.*

**10.** Only "sibling" nodes, that is, subdomains with the same "parent" domain, need be unique. *See* Albitz & Liu, *supra,* at § 2.1.1. Thus, while there may not be two jmu.edu's, there may be (and, in fact, there is) a princeton.com, as well as a princeton.edu.

at issue in this case, .com and .net. *See Thomas,* 176 F.3d at 504; *Goldfoot, supra* note 4, at 95. As discussed above, this means NSI is responsible for maintaining the database that directs DNS queries for domain names ending in TLDs within NSI's control to the appropriate SLD name server. NSI is also a registrar for these and other TLDs [11], which means that it "acts as go-between for domain name holders and the registry, providing various services, including the registration of domain names on a first-come, first-served basis." *Thomas,* 176 F.3d at 505; *see Network Solutions,* 529 S.E.2d at 84. Significantly, however, NSI does not maintain a record of the IP address for each computer that falls within its TLDs. As discussed above, that function is distributed across the Internet, on a multitude of name servers. Accordingly, the registrar and registry functions are limited to (i) assigning unique second level domain names for certain TLDs, and (ii) directing DNS queries to the appropriate SLD name server, which server will typically be controlled and maintained (as here) by someone other than NSI.

What this basic description of the DNS makes clear is that a "domain name" is a means of determining a particular computer address by way of a process that includes the registry and registrar functions of NSI (and other entities with similar responsibilities), as well as the operation of DNS name servers scattered across the Internet, almost all of which are operated and controlled by entities other than NSI or any other registrar. This process is not fail safe; it is subject to failure, in which case the domain name will not fulfill its purported function. And this may occur, even assuming NSI regularly meets each of its obligations under the relevant registration agreements, as NSI operates only a very small portion of the DNS. Thus, the

utility of a domain name depends in part on the registrar's meeting its obligations,[12] and in part on the operation of the DNS, only a small portion of which falls within the domain name registrar's control. It is against this technical and contractual background that plaintiffs seek to establish personal jurisdiction based on eAsia's contracts with NSI.

## III

When the exercise of personal jurisdiction is challenged pursuant to Rule 12(b)(2), Fed.R.Civ.P., the question "is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by the preponderance of the evidence." *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989). To survive the jurisdictional challenge, a plaintiff need only make a *prima facie* showing of a sufficient jurisdictional basis on the basis of the complaint and supporting affidavits. *See id.* In considering a defendant's challenge to personal jurisdiction, a court must construe all relevant allegations in the light most favorable to the plaintiff and draw the most favorable inferences for the existence of jurisdiction. *See id.*

Resolution of personal jurisdiction challenges involve a two-step inquiry. First, courts must ascertain whether a plaintiff has made a *prima facie* showing that Virginia's long-arm statute reaches the nonresident defendant given the cause of action alleged and the nature of the defendant's Virginia contacts. Second, a court must determine whether the exercise of personal jurisdiction in the circumstances is consistent with the Due Process Clause, that is, whether the long-arm statute's reach in the circumstances exceeds

---

**11.** Although NSI was once the sole registrar for the TLDs .com and .net, it is now only one of several registrars for these TLDs.

**12.** *Cf. Network Solutions, Inc.,* 529 S.E.2d at 86–88 (concluding that a domain name was not subject to garnishment because it was the product of a contract for services between the domain name registrar and registrant).

its constitutional grasp.[13] In that regard, it is settled that the language extending jurisdiction to the transaction of business in Virginia allows a court "to assert jurisdiction over nonresidents ... to the extent permissible under the due process clause." *Kolbe v. Chromodern Chair Co.,* 211 Va. 736, 740, 180 S.E.2d 664, 667 (1971). Nonetheless, it is possible that an entity's contacts with Virginia may satisfy due process, and still not fall within a particular provision of the Long Arm Statute. It is therefore appropriate to begin with the statutory analysis. *See TELCO Communications v. An Apple A Day,* 977 F.Supp. 404, 405 (E.D.Va.1997) (citing *DeSantis,* 949 F.Supp. at 423).

▮▮▮▮ Plaintiffs rely on the "transacting business" provision of the Long Arm Statute, which subjects a nonresident defendant to personal jurisdiction as to any cause of action "arising from" that defendant's transaction of business in Virginia. *See* Va.Code § 8 8.01–328.1(A)(1).[14] As a preliminary matter, assuming eAsia transacted business in Virginia by registering the allegedly infringing domain names

with NSI, the sole cause of action arising from that transaction of business is the ACPA claim. This is so because a claim of trademark infringement or dilution arises from the commercial use of a domain name that is similar or identical to a person's trademark, and not from the mere registration of the domain name.[15] Thus, for domain name disputes based on federal or common law trademark infringement or dilution, the relevant tortious act is the *use* of the domain name, and not the act of registration. The ACPA, however, provides a cause of action against a domain name registrant based on the bad faith registration[16] of a domain name that is identical or confusingly similar to, or in the case of a famous mark, dilutive of, the trademark owner's mark or marks. *See* 15 U.S.C. § 1125(d)(1)(A). Accordingly, only plaintiff's ACPA claim "arises from" the transaction between eAsia and NSI.

Next in the statutory analysis is the central question whether eAsia transacted business in Virginia by registering the allegedly infringing domain names with NSI.[17] In this regard, it is settled that a

13. *See Bochan v. La Fontaine,* 68 F.Supp.2d 692, 697–98 (E.D.Va.1999); *DeSantis v. Hafner Creations, Inc.,* 949 F.Supp. 419, 422 (E.D.Va.1996); *see also Peanut Corp. of Am. v. Hollywood Brands, Inc.,* 696 F.2d 311, 313 (4th Cir.1982).

14. Plaintiffs, correctly, do not urge any other statutory bases for personal jurisdiction. The use by eAsia or its affiliates of the ICQ mark on a web page maintained in Asia is not a tortious act that occurred in Virginia. *See* Va.Code § 8.01–328.1(A)(3). And assuming eAsia's out-of-state act caused tortious injury in Virginia, and further assuming that eAsia "regularly ... solicits business" in Virginia by operating a commercial web site that is accessible here, *see* Va.Code § 8.01–328.1(A)(4), operation of such a web site does not, by itself, satisfy the minimum requirements of the due process clause for the exercise of personal jurisdiction. *See Rannoch,* 52 F.Supp.2d at 684–85.

15. *See, e.g., Panavision International, L.P. v. Toeppen,* 141 F.3d 1316, 1324 (9th Cir.1998) (noting that there must be some commercial use of the domain name, to establish liability under the Lanham Act).

16. The ACPA requires the trademark owner to show more than mere registration; the owner must also show that the registrant had a bad faith intent to profit from registration of the mark as a domain name, which derives in significant part from the registrant's actual or intended use of the domain name. *See* 15 U.S.C. § 1125(d)(1)(B)(1) (non-exclusive list of factors that may be considered to prove bad faith intent to profit).

17. Plaintiffs note that eAsia, and corporations related to eAsia, may have registered several other domain names not in issue in this case. Yet, the instant ACPA claim does not arise from those registrations, and therefore they are not relevant under Va.Code § 8.01–328.1(A)(1). *See City of Virginia Beach v. Roanoke River Basin Ass'n,* 776 F.2d 484, 488 (4th Cir.1985) (noting that only contacts related to the cause of action give rise to personal jurisdiction under § 8.01–1–328.1(A)(1)). Similarly, the mere registration of several domain names with NSI is not a sufficient basis for general jurisdiction over claims unrelated to those contacts. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 418, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)

single act may constitute the transaction of business in Virginia,[18] and that the nonresident need not be physically present in Virginia to transact business within this jurisdiction.[19] It is also settled that a nonresident transacts business in Virginia where the nonresident establishes an ongoing contractual relationship with a Virginia firm that requires the latter to perform work in Virginia.[20] Given this, the instant transaction arguably falls within the plain language of Virginia Code § 8.01–328.1(A)(1), as eAsia contacted NSI, a firm located in Virginia, to take advantage of NSI's services—services that NSI performed at least in part in Virginia. Yet, the act of registering a domain name over the Internet, the payment of the small, annual maintenance fee, and NSI's obligations stemming from acceptance of the registration, seem so modest in scope and nature that it is difficult to view it as "transacting business" in the registrar's state of residence.[21] In similar circumstances, *i.e.*, where the statutory issue appears to be a close one, courts sometimes (explicitly or implicitly) assume or skip

over the statutory issue and proceed directly to the due process analysis.[22] A similar approach is appropriate here.

## IV

The Due Process Clause requires that no defendant shall be haled into court unless the defendant has "certain minimum contacts [with the state] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Although lack of physical presence in the forum is not dispositive,[23] jurisdiction is only appropriate where a defendant has " 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities.' " *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Thus, the defendant must have " 'purposefully avail[ed] itself of the privilege of conducting activities within the forum State,' . . .

("[M]ere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions.").

**18.** *See City of Virginia Beach,* 776 F.2d at 487; *Gallop Leasing Corp. v. Nationwide Mutual Ins. Co.,* 244 Va. 68, 71, 418 S.E.2d 341, 342 (1992); *Kolbe, Inc. v. Chromodern Chair Co.,* 211 Va. 736, 740, 180 S.E.2d 664, 667 (1971).

**19.** *See, e.g., English & Smith v. Metzger,* 901 F.2d 36, 38–39 (4th Cir.1990) (finding that a resident of California transacted business in Virginia, where the nonresident's sole contacts with the resident were by telephone and mail); *cf. Bochan v. La Fontaine,* 68 F.Supp.2d 692, 698–99 (E.D.Va.1999) (finding that a resident of Texas committed a tort in Virginia by posting a message on an electronic bulletin board physically located and stored on a server in Virginia).

**20.** *See English & Smith,* 901 F.2d at 36 (nonresident transacted business in Virginia, when he had an ongoing contractual relationship with a law firm in Virginia, that required the

firm to perform legal work in Virginia on behalf of the nonresident).

**21.** In this regard, the transaction between eAsia and NSI stands in marked contrast to the transaction at issue in *English & Smith.* The contract in *English & Smith* involved the negotiation of the terms of the contract, and the performance of substantial legal services in Virginia over a period of time. *See* 901 F.2d at 39. By contrast, eAsia's registration of the domain names at issue was brief, conducted over the Internet, and involved no negotiation of terms, nor the performance of substantial services in Virginia over time. Instead, NSI simply had to maintain eAsia's SLD server information in its database, and make that information available to the DNS.

**22.** *See, e.g., Danville Plywood Corp. v. Plain and Fancy Kitchens, Inc.,* 218 Va. 533, 534, 238 S.E.2d 800, 801–02 (1977) (relying entirely on due process analysis, rather than statutory analysis, to limit the reach of the Long Arm Statute where nonresident contracted for the manufacture of goods by a Virginia firm, but otherwise had no contact with Virginia).

**23.** *See English & Smith,* 901 F.2d at 39.

to ensure that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Id.* at 475, 105 S.Ct. 2174 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)).

■ These principles compel the conclusion that the two domain name registration agreements with NSI from which plaintiffs' ACPA claim arises are not sufficient contacts with Virginia for purposes of personal jurisdiction over eAsia in this case. While it is clear that NSI and eAsia had a contractual relationship, it is settled that a contract between a resident of the forum state and a nonresident defendant does not, by itself, provide sufficient minimum contacts for personal jurisdiction. *See, e.g., Ellicott Machine Corp., Inc. v. John Holland Party Ltd.*, 995 F.2d 474, 478 (4th Cir.1993) ("[A] contract in and of itself does not automatically constitute sufficient minimum contacts to support personal jurisdiction."). Instead, the jurisdictional

analysis must focus on the circumstances of the contract negotiations, the contract's execution, and the relationship the contract has to the forum state.[24] Here, neither the circumstances of the contracts' execution or negotiation, nor the relationship of the contracts to the forum state are sufficient to establish personal jurisdiction over eAsia.[25] With respect to the circumstances of the contracts' execution, eAsia entered into a standard registration agreement with NSI, and therefore there would have been no occasion for preliminary negotiations between eAsia and NSI, in Virginia or anywhere else. On each occasion in which eAsia contacted NSI in the course of registering the allegedly infringing domain names, it did so by way of NSI's web page, using a computer located in either California, where eAsia is incorporated, or Taipei, Taiwan, where it has its principal place of business. Each transaction with NSI was certainly brief, and involved little interaction, and no negotiation of terms; eAsia simply requested the domain name, provided NSI the appropriate contact and

**24.** In *Burger King*, 471 U.S. at 479, 105 S.Ct. 2174, the Supreme Court ruled that a contract may establish sufficient minimum contacts between a nonresident party to the contract and the resident party's forum, based on the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." There, a contractual relationship established sufficient minimum contacts where (i) the nonresident defendant "purchased a long-term franchise" from the resident of the forum state, (ii) the franchise agreement contemplated "continuing and wide-reaching contacts" with that resident, and the nonresident defendant accepted the "long-term and exacting regulation of his business" from the resident's headquarters in the forum state. *See Burger King*, 471 U.S. at 479–80, 105 S.Ct. 2174. By contrast, a panel of the Fourth Circuit has ruled that nonresident corporations did not have minimum contacts with Maryland, where they (i) "entered into a contract to buy a license for copyrighted software from the Maryland corporate plaintiff," (ii) "telephoned the plaintiff for information as to the use of the software," (iii) "responded to requests for sales information from Maryland agents of the plaintiff," and

(iv), "attempted to collect amounts owed to the out-of-state clients by some Maryland residents." *Autoscribe Corp. v. Goldman*, 47 F.3d 1164, 1995 WL 56662, at *1 (4th Cir. Dec. 6, 1994) (unpublished disposition); *see also Ellicott Machine Corp., Inc.*, 995 F.2d at 478–79 (holding that a contract with resident of forum state was insufficient basis for personal jurisdiction).

**25.** eAsia notes that when it registered the domain names, NSI was the only organization authorized to issue domain names in the .com and .net TLDS, and that NSI, though a private firm, issued domain names pursuant to a government contract. These facts do not affect the jurisdictional analysis in this case. NSI is a private firm from whom eAsia chose to purchase certain services, and for that reason, eAsia may not avail itself of the so-called "government contacts" exception to state long arm statutes. *See, e.g., Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 786–87 (D.C.Cir.1983) (entity does not transact business in a forum when its sole contact with the forum arises from the act of petitioning a government agency in that forum).

technical information, paid for the service, and agreed to pay the small annual fee as it came due. Similarly, the agreement between eAsia and NSI created no occasion for future substantive interaction between eAsia and NSI, in Virginia or anywhere else, other than the payment of the annual fee. Finally, NSI does not hold itself out as a Virginia company, and eAsia did not choose to register its domain names with NSI on the basis of its residency in Virginia. Indeed, eAsia may not have even known the component of NSI with which it dealt was located in Virginia; while the contract has a forum selection clause, corporations routinely operate in many different states, yet choose one state in which to litigate claims arising from its contracts.[26] For these reasons, the circumstances of the contracts' negotiation and execution do not suggest that eAsia purposefully directed its activities to Virginia.

Similarly, the domain name registration agreements do not create a sufficient relationship between eAsia and Virginia to satisfy due process. *See Chung v. NANA Development Corp.*, 783 F.2d 1124, 1128 (4th Cir.1986) (stating that a contract between a resident and nonresident must have a "substantial connection" with the forum state to provide sufficient minimum contacts for specific jurisdiction). First, unlike the franchise contract at issue in *Burger King*,[27] the contracts between eAsia and NSI created no ongoing relationship of substance, any more than a magazine subscription creates an ongoing relationship between the publisher and subscriber. eAsia's primary obligation is to pay a relatively small annual fee to NSI, while NSI's primary obligation is to maintain the database that directs DNS queries using eAsia's domain names to eAsia's name servers. Indeed, as discussed in Part II, *eAsia* must ensure that its name servers direct requests to the specific computer identified by its domain names.

Second, while NSI performs its services in Virginia, NSI's services do not create nearly as substantial a relationship between eAsia and NSI in Virginia, as did the agreement between the nonresident and resident in *English & Smith. See* 901 F.2d at 39–40. Whereas the resident in *English & Smith* performed a variety of legal services for the nonresident, NSI simply created, and now maintains, two tiny database entries on eAsia's behalf. Similarly, eAsia's relationship with NSI does not create a significant presence in Virginia, physically or electronically: NSI stores no content on its servers for eAsia, is not eAsia's Internet Service Provider, does not provide technical support for eAsia's web servers, and does not otherwise provide a "portal" to eAsia's web page.[28]

---

**26.** Plaintiffs argue that the forum selection clause in the registration agreement is evidence that eAsia knew it was availing itself of Virginia's laws when it registered the domain names at issue. In fact, by the agreement, eAsia agreed to litigate claims *with NSI* in Virginia, not claims between eAsia and any third party. A forum selection clause is a bargained-for term in a contract between the contracting parties, and for that reason it may not, in most instances, be enforced by one who is not a party to the contract. *See, e.g., Frietsch v. Refco, Inc.*, 56 F.3d 825, 827 (7th Cir.1995) (noting that a nonparty may enforce a forum selection clause against a signatory to the contract containing that clause, only where the non-party is "closely related" to one of the signatories).

**27.** *See* 471 U.S. at 479–80, 105 S.Ct. 2174.

**28.** Some courts have found personal jurisdiction where the nonresident has made substantial use of servers or other computers located in the forum. *See, e.g., Intercon, Inc. v. Bell Atlantic Internet Solutions Inc.*, 205 F.3d 1244, 1248 (10th Cir.2000) (personal jurisdiction available based on defendants unauthorized and knowing use of plaintiff's servers located in forum); *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1266–67 (6th Cir.1996) (personal jurisdiction appropriate based on defendant's knowing use of plaintiff's computer servers and Internet services located, which were located in the forum state, to market and distribute his software); *Bochan v. La Fontaine*, 68 F.Supp.2d 692, 699 (E.D.Va.1999) (personal jurisdiction based in part on nonresident's use of server located in forum).

The sole eAasia "presence" in Virginia is the entry of eAsia's second level domain names on NSI's servers. Even assuming that a domain name registration is a "thing" that may be located in Virginia,[29] it is nonetheless a relatively minor portion of the Internet's architecture, and a minuscule presence in this Commonwealth; in terms of physical or electronic presence, it is merely " 'a reference point in a computer database.' " *Network Solutions*, 529 S.E.2d at 85 (quoting NSI's description of a domain name). Finally, NSI's services under the agreements are offered in support of eAsia's Internet activities, which emanate entirely from eAsia's servers in Asia.[30] NSI supports its registrants' Internet activities wherever those activities may occur, and notwithstanding where those activities are directed.[31] In sum, the registration agreements are not substantially related to this forum, and eAsia's limited Internet contacts with NSI may not otherwise form the basis for personal jurisdiction in this case. For these reasons, by registering the two domain names at issue here, eAsia did not purposefully direct its activities at this forum, and due process would be offended were personal jurisdiction granted based on those contacts.[32]

■ Plaintiffs claim that a finding of personal jurisdiction is warranted in this case because eAsia purposefully directed its activities toward Virginia by infringing the trademarks of two corporations located in Virginia. Courts have addressed the question whether a person may be haled into court in a trademark owner's home

**29.** The Supreme Court of Virginia recently suggested otherwise when it held that a domain name is "inextricably bound to the domain name services that NSI provides," and was for that reason not subject to garnishment. *See Network Solutions, Inc. v. Umbro Int'l, Inc.*, — Va. ——, 529 S.E.2d 80, 86 (Va.2000). By this view, a domain name is not a "thing" with a particular location, as it does not "exist[ ] separate from [the] service that created it and that maintains its continued liability." *Id.* at 87.

**30.** *See Health Communications, Inc. v. Mariner Corp.*, 860 F.2d 460, 465 (D.C.Cir.1988) (personal jurisdiction over corporation did not exist where corporation's sole contact with forum was the purchase of services from a resident of that forum, even where some of the services were performed in the forum).

**31.** *See Health Communications*, 860 F.2d at 465 (holding that "a purchaser who selects an out-of-state seller's goods or services based on their economic merit does not thereby purposefully avail itself of the seller's state law," even though a portion of the services were performed in the forum, where the contract is not significantly related to the forum); *Danville Plywood Corp. v. Plain and Fancy Kitchens, Inc.*, 218 Va. 533, 534, 238 S.E.2d 800, 801–02 (1977) (nonresident purchaser did not have minimum contacts with Virginia, even though it ordered plywood panels from a Virginia company, for delivery F.O.B. Danville, Virginia).

**32.** Plaintiffs rely exclusively on two recent cases for the opposite proposition, namely that the fact of registration with NSI by itself establishes sufficient minimum contacts with Virginia to satisfy due process. *See Lucent Technologies, Inc. v. Lucentsucks.Com*, 95 F.Supp.2d 528, 531 n. 5 (E.D.Va.2000); *Caesars World Inc. v. Caesars–Palace.com*, 54 U.S.P.Q.2d 1121, 1123 (E.D.Va.2000). These cases are distinguishable; both were *in rem*, not (as here) *in personam* proceedings. While the court in *Lucent Technologies* noted that personal jurisdiction in Virginia would be available over a person by virtue of his having registered a domain name with NSI, the question was not squarely before the court, and the statement is thus dicta. *See Lucent Technologies*, 95 F.Supp.2d at 531 n. 5. In fact, another case, also in dicta, suggests the opposite conclusion. *See Playboy Enters. Inc. v. Asiafocus Int'l, Inc.*, 1998 WL 724000, at *5 (E.D.Va.1998) (unpublished disposition) (noting that mere registration with NSI might not provide a basis for jurisdiction, though not reaching the issue as jurisdiction existed on other grounds).

In *Caesars World*, the court was presented with the question whether the ACPA's *in rem* provisions violated due process. The court concluded that, in light of the limited relief available under the *in rem* proceeding, namely forfeiture of the domain name in question, the registrant's contact with NSI satisfied due process. *See* 54 U.S.P.Q.2d at 1123 (citing 15 U.S.C. § 1125(d)(2)(D)). An *in personam* action, by contrast, affects much more than the domain name; plaintiffs seek damages and injunctive relief, which will attach to eAsia should plaintiffs prevail.

state, based solely on the registration of an allegedly infringing domain name, or the operation of a web site that uses an allegedly infringing trademark. In this regard, it is established that the mere registration of a domain name that is similar or identical to a trademark, or the operation of a passive web site using the allegedly infringing domain name, is not a sufficient basis for personal jurisdiction in the trademark owner's domicile.[33] On the other hand, some courts have held that where a person registers a domain name that is similar or identical to a trademark and directs his or her activity at the forum state by, for example, offering the domain name for sale to the trademark owner, that person's activities may be construed as intentionally directed at the trademark owner's domicile.[34]

In this case, plaintiffs contend that eAsia purposefully directed its activity at Virginia, because eAsia knowingly infringed plaintiffs' trademarks, and plaintiffs suffered the injury from that infringement in Virginia. Yet, where personal jurisdiction is based on the place at which "the plaintiff feels the alleged injury," the plaintiff must also show that its injury is "accompanied by the defendant's own contacts with the state." *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir.1997). In this case, there is simply no evidence that eAsia purposefully directed any activity towards Virginia. First, the record reflects that eAsia's Internet activities are aimed primarily, if not exclusively, at Taiwan and other parts of Asia,[35] and there is no evidence that eAsia directed *any* of its marketing or distribution activities toward Virginia or, for that matter, the United States.[36] Second, there is no evidence that eAsia purposefully directed its activities towards Virginia by offering the allegedly domain names for sale to plaintiffs or anyone else.[37] Plaintiffs have identified no commercial or tortious effort directed at Virginia, other than the registration of the domain name with NSI, and for the reasons discussed above that is simply not a sufficient contact with Virginia to establish personal jurisdiction.[38]

**33.** *See, e.g., Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418–20 (9th Cir.1997) (finding that Florida company using the domain name <cybsell.com> and the tradename CyberSell was not subject to personal jurisdiction in domicile of plaintiff alleging trademark infringement); *Rannoch*, 52 F.Supp.2d at 685 (concluding that personal jurisdiction was inappropriate in alleged cybersquatting case, based on lack of evidence that owner of domain name similar to plaintiff's trademark was aware of plaintiff's trademark rights); *cf. GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349–50 (D.C.Cir.2000) (merely operating a web site that may be accessed in the forum state does not establish personal jurisdiction in the forum state).

**34.** *See, e.g., Panavision International, L.P. v. Toeppen*, 141 F.3d 1316, 1322–24 (9th Cir. 1998) (concluding that a person who registers a trademark as a domain name and offers that domain name for sale to the trademark owner may be subject to personal jurisdiction in the trademark owner's domicile).

**35.** The record reflects that (i) the language on eAsia's web sites is almost exclusively Chinese, (ii) eAsia aims its marketing and other activities at Taiwan and other parts of China,

(iii) all of eAsia's servers are located in Asia, and (iv) the uncontroverted affidavit of eAsia's president notes that eAsia's web sites "offer features, products, and/or services that would not likely be of value to Virginia residents."

**36.** *See Rannoch*, 52 F.Supp.2d at 685–86; *cf. Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1126 (W.D.Pa.1997) (finding that nonresident had purposefully availed itself of the forum state, by selling Internet services to 3000 subscribers in the forum state and contracting with seven ISP's in the forum state "to furnish its services to their customers").

**37.** *See Panavision Int'l, L.P.*, 141 F.3d at 1322–24 (concluding that a person who registers a trademark as a domain name and offers that domain name for sale to the trademark owner may be subject to personal jurisdiction in the trademark owner's domicile); *No Mayo–San Francisco v. Memminger*, 1998 WL 544974, at *4 (N.D.Cal. Aug.20, 1998). (unpublished disposition) (dismissing a cybersquatting claim for lack of personal jurisdiction, and distinguishing *Panavision International* on the ground that there was no evidence of cyberpiracy).

For these reasons, eAsia's motion to dismiss for lack of personal jurisdiction must be granted, and thus the motion to dismiss for lack of venue must be denied as moot.

An appropriate order will enter.

---

**38.** Plaintiffs note that Congress passed the ACPA in part to make it easier to bring suits against cybersquatters. While this may be so, nothing suggests that Congress intended personal jurisdiction to exist wherever the registrant's allegedly infringing domain name happens to be registered. In fact, Congress specifically provided that, in the event personal jurisdiction was not available, an *in rem* action would be available at the situs of the registrar. *See* 15 U.S.C. § 1125(d)(2); *see also Caesars World Inc. v. Caesars–Palace.com,* 54 U.S.P.Q.2d 1121, 1123 (E.D.Va. 2000).