370 F.3d 860
 Lilian S. ILETO, an individual and mother to Joseph S. Ileto, deceased; Joshua Stepakoff, a minor, by his parents Loren Lieb and Alan B. Stepakoff; Mindy Gale Finkelstein, a minor, by her parents David and Donna Finkelstein; Benjamin Kadish, a minor by his parents Eleanor and Charles Kadish; Nathan Lawrence Powers, a minor by his parents Gail and John Michael Powers, for himself and on behalf of a class of persons similarly situated, Plaintiffs-Appellants,
v.
GLOCK INC., a Georgia Corporation; China North Industries Corp., a Chinese entity aka Norinco; Davis Industries, a California Corporation; Republic Arms Inc., a California Corporation; Jimmy L. Davis, an individual; Bushmaster Firearms, a Maine Corporation; RSR Management Corporation; RSR Wholesale Guns Seattle Inc., Defendants-Appellees, and
Maadi, an Egyptian business entity; Imbel, a Brazilian business entity; The Loaner Pawnshop Too, a Washington Corporation; David McGee, an individual; Glock GMBH, an Austrian business entity, Defendant.
 No. 02-56197.
 United States Court of Appeals, Ninth Circuit.
 Filed May 28, 2004.
 
 Peter Nordberg, Berger & Montague, P.C., Philadelphia, PA, Frank D. Hobbs, Rutter Hobbs & Davidoff, Los Angeles, CA, Sayre Weaver, La Habra, CA, Richard Lewis, Cohen, Millstein, Hausferl & Toll PLLC, Washington, DC, David Kairys, Philadelphia, PA, Joshua M. Horwitz, Washington, DC, for Plaintiffs-Appellants.
 Robert Tafoya, Akin, Gump, Strauss, Huer & Feld, Los Angeles, CA, Mark T. Palin, Arter & Hadden, Irvine, CA, John f. Renzulli, Christopher Renzulli, Renzulli, Pisciotti & Renzulli, LLP, New York, NY, Charles H. Dick, Jr., Baker & McKenzie, San Diego, CA, Stephen H. Zell, Madory, Booth, Zell & Pleiss, Law Offices, Tustin, CA, Daniel K. Dik, Fonda & Fraser, LLP, Los Angeles, CA, John F. Renzulli, Renzulli & Rutherford, LLP, New York, NY, for Defendants-Appellees.
 Before: HALL, THOMAS, and PAEZ, Circuit Judges.
 
 ORDER
 
 1
 The panel majority has voted to deny the petition for panel rehearing and petition for rehearing en banc. Judge Hall voted to grant the petition for panel rehearing, and recommended granting the petition for rehearing en banc.
 
 
 2
 The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc reconsideration. Fed. R.App. P. 35.
 
 
 3
 The petition for rehearing en banc is denied.
 
 
 4
 CALLAHAN, Circuit Judge, with whom Circuit Judges KOZINSKI, O'SCANNLAIN, KLEINFELD, GOULD, TALLMAN, BYBEE, and BEA join, dissenting from the denial of rehearing en banc:
 
 
 5
 I respectfully dissent from the court's decision not to hear this case en banc. The opinion of the majority of the panel improperly and inaccurately interprets California's negligence and public nuisance law to expand wrongly the exposure of manufacturers. Furthermore, if California's negligence and public nuisance law were so unsettled as to allow for the majority's creative interpretation of California law, we should have certified the issues to the California Supreme Court.
 
 
 6
 * This is indeed a tragic case. On August 10, 1999, Buford Furrow, a mentally troubled man who was prohibited by federal law from purchasing a gun, approached the North Valley Jewish Community Center (JCC) in Granada Hills, California. He was armed with a number of firearms. He entered the JCC and proceeded to shoot and injure three young children, one teenager, and one adult. Furrow fled the JCC and, later that day, shot and killed Joseph Ileto, a United States Postal worker.
 
 
 7
 This action, as it comes before this court, is not against Furrow or even against the entities that sold the weapons to Furrow, but against the entities that manufactured the weapons outside of California and sold them outside of California.
 
 
 8
 The plaintiffs allege that the defendant gun manufacturers and distributors produce, distribute, and sell more firearms than legal purchasers can buy, and that they knowingly facilitate, and benefit from, a secondary market where persons who are illegal purchasers and have injurious intent obtain their firearms. Plaintiffs do not allege that Glock[1] did anything illegal. Rather, they argue that Glock knew that the secondary market "regularly provides guns to criminals and underage end users," but nonetheless failed to "exercise reasonable care to protect the public from the risks created by the distribution and marketing schemes that create an illegal secondary market."
 
 
 9
 Plaintiffs also assert a broad nuisance claim. According to the plaintiffs, Glock's marketing and distribution policies "knowingly created and maintained an unreasonable interference with rights common to the general public, constituting a public nuisance under California law." Plaintiffs allege that "this interference is not insubstantial or fleeting, but rather involves a disruption of public peace and order in that it adversely affects the fabric and viability of the entire community."
 
 
 10
 The critical feature of these claims is their breadth. Again, Glock is not alleged to have done anything illegal. Rather, its liability is based on a theory that it failed to reduce profits because it allegedly knew (or a factfinder might find that it should have known) that its heightened output (all of which is legally sold) created a surplus in a secondary market, which Glock allegedly knew was utilized by "criminals and underage end users." How many other manufacturers or distributors of products that find their way into California will be burdened with similar allegations?
 
 
 11
 In the field of products liability, courts have extended concepts such as duty and causation to encompass end users and victims of defective products. Plaintiffs, however, do not allege that the underlying firearms were defective. Nevertheless, the panel in countenancing plaintiffs' theories takes product liability concepts of duty and causation and applies them to common negligence and public nuisance laws.
 
 
 12
 The potential impact of the panel's decision is staggering: Any manufacturer of an arguably dangerous product that finds its way into California can be hauled into court in California to defend against a civil action brought by a victim of the criminal use of that product. The manufacturer's liability will turn not on whether the product was defective, but whether its legal marketing and distribution system somehow promoted the use of its product by "criminals and underage end users." Thus, General Motors could be sued by someone who was hit by a Corvette that had been stolen by a juvenile. The plaintiff would allege that General Motors knew that cars that can greatly exceed the legal speed limit are dangerous, and through advertising and by offering discounts, it increased the attractiveness of the car and the number of Corvettes on the road and thus increased the likelihood that a juvenile would steal a Corvette and operate it in a injurious manner.
 
 B
 
 13
 This is not California law. The majority of the panel admits as much when it writes, "[b]ecause we are sitting in diversity, and there are no supreme court or appellate court decisions in California that have addressed the specific claims alleged by the plaintiffs, we must attempt to determine how the California Supreme Court might decide the issue." Ileto v. Glock, Inc., 349 F.3d 1191, 1200 (9th Cir.2003). I disagree. We should not have attempted "to determine how the California Supreme Court might decide the issue," but should have certified the issue to the California Supreme Court to allow it to decide the issue in the first instance (see section G). Furthermore, if we must predict what California law is, Judge Hall's dissent accurately reflects the considerations and precedents bearing on the issues and explains why the California Supreme Court would not rule in the manner theorized by the panel.
 
 C
 
 14
 The impropriety of the majority's attempt to import product liability concepts into common negligence law may be seen in its treatment of the California Supreme Court's decision in Merrill v. Navegar, Inc., 26 Cal.4th 465, 110 Cal.Rptr.2d 370, 28 P.3d 116 (2001). That case arose out of another tragic incident in which a man armed with rapid-firing handguns entered a law office in San Francisco and killed eight persons and wounded six before killing himself. Id. at 472, 110 Cal.Rptr.2d 370, 28 P.3d 116.
 
 
 15
 Plaintiffs, survivors and representatives of some of the victims, sued the manufacturer of the handguns on a common law negligence theory. Id. at 470, 473, 110 Cal.Rptr.2d 370, 28 P.3d 116. Plaintiffs sought to hold Navegar liable for its decision to make guns available for sale to the general public that it "knew or should have known have `no legitimate sporting or self-defense purpose' and which are `particularly well-adapted to a military-style assault on large numbers of people.' " Id. at 474, 110 Cal.Rptr.2d 370, 28 P.3d 116. The California Supreme Court, in a 6 to 1 decision, affirmed the trial court's grant of summary judgment for Navegar on the ground that plaintiffs' common law negligence claim was barred by California Civil Code § 1714.4. Id. at 491-92, 110 Cal.Rptr.2d 370, 28 P.3d 116.
 
 
 16
 The majority here distinguishes Merrill by concluding that plaintiffs' claims are not barred by Cal. Civ.Code § 1714.4[2] and noting the differences between the claims in Merrill and this case. Ileto, 349 F.3d at 1200-02. The majority's differentiation of the claims in Merrill reflects a lack of appreciation of California law.
 
 
 17
 The majority distinguishes Merrill on the grounds that, there, the guns were alleged to be defective, whereas here, the plaintiffs acknowledge that the products were not defective. Id. at 1201. This allows the majority to opine that "this case is not a products liability case re-framed as a negligence case, but rather it is a classic negligence and nuisance case." Id. at 1202. This is not a classic negligence case.
 
 
 18
 The first element of a negligence claim is duty. Glock sold the gun to a police department in Washington, and allegedly facilitated the gun's subsequent sale to a former police officer, Dineen, who had a gun store. Dineen sold the gun to a gun collector, who allegedly did not have a firearms license. He sold it to another unlicensed gun collector, who allegedly sold it to Furrow in Washington State. The concept that the manufacturer may be liable to the ultimate user or victim is accepted in product liability law, but according to the majority, plaintiffs' claim is not based on product liability. Why then should Glock be held liable for the criminal action of an end-user of a product that is not defective?
 
 
 19
 The majority answers this question by conflating duty, which is a question of law, with foreseeability. The majority reasons:
 
 
 20
 The allegations here that the defendants created an illegal secondary firearms market that was intentionally directed at supplying guns to prohibited gun purchasers like Furrow are more than sufficient to raise a factual question as to whether the defendants owed the plaintiffs a duty of care and whether the defendants breached that duty. As the California Supreme Court has stated, a defendant's duty of care extends to those individuals a defendant puts at an unreasonable risk of harm through the reasonably foreseeable actions of a third party. Here, plaintiffs have alleged sufficient facts for a reasonable jury to conclude that through their distribution practices, defendants have created an illegal secondary market targeting prohibited purchasers that placed plaintiffs in a situation in which they were exposed to an unreasonable risk of harm through the reasonably foreseeable conduct of a prohibited purchaser like Furrow.
 
 
 21
 Id. at 1204 (internal citation omitted). This is a fancy way of saying that, because plaintiffs allege that it was foreseeable that someone like Furrow would obtain and misuse a gun, ergo Glock has a duty to anyone who is harmed by Furrow's misuse of the gun.
 
 
 22
 This is not the law in California. Under California law, the concept of duty in an action alleging common law negligence is a multi-pronged inquiry, and is not limited to determining the foreseeability of harm to the plaintiffs. See Rowland v. Christian, 69 Cal.2d 108, 112-13, 70 Cal.Rptr. 97, 443 P.2d 561 (1968). Moreover, under negligence law, a defendant has no duty to control the conduct of a third party, absent a special relationship between the defendant and the third party. Jacoves v. United Merch. Corp., 9 Cal.App.4th 88, 114, 11 Cal.Rptr.2d 468 (1992); Martinez v. Pac. Bell, 225 Cal.App.3d 1557, 1567, 275 Cal.Rptr. 878 (1990).
 
 
 23
 The majority not only incorrectly determined that the harm to Furrow's victims was foreseeable, it also failed to address any of the remaining factors in the duty inquiry. Specifically, the panel failed to analyze: (1) the closeness of connection between the conduct of the defendant and the injury; (2) the moral blame attached to the defendant's conduct; (3) the policy of preventing future harm; (4) the extent of the burden to the defendant; (5) the consequences to the community of imposing a duty to exercise care with resulting liability for breach; and (6) the availability, cost, and prevalence of insurance for the risk involved. See Merrill, 26 Cal.4th at 477, 110 Cal.Rptr.2d 370, 28 P.3d 116 (quoting Rowland, 69 Cal.2d at 113, 70 Cal.Rptr. 97, 443 P.2d 561).[3] As applied to plaintiffs' allegations, none of these elements support the legal conclusion that Glock owed a duty to the victims of Furrow's criminal actions.
 
 D
 
 24
 The majority also improperly uses product liability concepts of causation to determine that Glock's alleged encouragement of the secondary market was the cause of the underlying injuries. First, relying principally on cases from other states, the majority concludes that it cannot disprove a negative: it cannot find that Glock owed no duty to plaintiffs. Second, relying on a medical malpractice case, Landeros v. Flood, 17 Cal.3d 399, 131 Cal.Rptr. 69, 551 P.2d 389 (1976), the majority surmises that "it was reasonably foreseeable that if Glock continued to foster the illegal secondary market, a person like Furrow who was prohibited by law from purchasing a gun would be able to purchase one and use the gun in the manner that was the basis for prohibiting such purchases in the first place." Ileto, 349 F.3d at 1209.
 
 
 25
 This approach is contrary to the law that defendants do not have a duty to control the activities of third parties, absent a special relationship. In Martinez, a California court noted: "Whether liability is based upon nuisance or negligence, the scope of that liability has been similarly measured: It extends to damage which is proximately or legally caused by the defendant's conduct, not to damage suffered as a proximate result of the independent intervening acts of others." 225 Cal.App.3d at 1565, 275 Cal.Rptr. 878.
 
 
 26
 As noted by Judge Hall in her dissent, this is the clear import of Jacoves. Ileto, 349 F.3d at 1222-23. There, the California court held that the plaintiffs did not have a cause of action against the store that sold a "confused, distraught, and trembling" young man a rifle, which he then used to commit suicide, because, as a matter of law, the store had no duty to refuse to sell the rifle to the young man. Jacoves, 9 Cal.App.4th at 118, 11 Cal.Rptr.2d 468. The court explained: "In order to impose a duty on Big 5 to refuse to sell the rifle and ammunition to Jonathan, the complaint must allege that Big 5 knew, or had reason to know, that Jonathan was reasonably likely to use the rifle to harm himself." Id. If a store that sells a rifle to a "confused, distraught, and trembling" young man does not legally foresee his use of the rifle on himself, how, under California law, may Glock be said to have legally foreseen that a person it did not know would buy a gun in Washington State, from a seller Glock did not know, and proceed to shoot at children in Los Angeles and kill a postal worker? Unlike the fact situation in Landeros — a case concerning a doctor's alleged failure to diagnose and treat battered child syndrome — Glock did not know, and could not have known of Furrow, or of any of his victims.[4]
 
 E
 
 27
 The panel majority's holding that plaintiffs have a cause of action under a nuisance theory is also contrary to California law, as noted by Judge Hall in her dissent. Ileto, 349 F.3d at 1223-24. Nuisance cases have uniformly required some property to be protected against the nuisance. See City of San Diego v. U.S. Gypsum Co., 30 Cal.App.4th 575, 585, 35 Cal.Rptr.2d 876 (1994). Under the majority's creative theory, " nuisance' would become a monster that would devour in one gulp the entire law of tort.'" Id. at 586, 35 Cal.Rptr.2d 876 (quoting Tioga Pub. Sch. Dist. v. U.S. Gypsum, 984 F.2d 915, 921 (8th Cir.1993)).
 
 F
 
 28
 The disruptive impact of the majority's decision is not minimized by the fact that this appeal is from the grant of a motion to dismiss under Fed.R.Civ.P. 12(b)(6), nor is it mitigated by the fact that the majority's interpretation of California law is not binding on California courts.
 
 
 29
 If the majority's theory holds, gun manufacturers may have massive and industry-transforming potential liability for all gun-related violent crime in California. Furthermore, by converting duty and causation into a foreseeability test, the majority has created a standard that, as a practical matter, is immune from motions to dismiss under Fed.R.Civ.P. 12(b)(6) or motions for summary judgment. The very fact that a tragedy occurred — that someone was killed or injured by the defendant's product — makes its "foreseeability" a question for the factfinder, the jury.
 
 
 30
 The practical costs of forcing manufacturers to defend to juries all non-meritorious claims, as well as arguably meritorious claims, for all injuries that occurred in California cannot help but have a substantial impact on California's economy.
 
 
 31
 The irony of the majority's decision is that its creative interpretation of California law also burdens the federal district courts. California state courts are free to disregard the panel's decision, but federal district courts in California are not. Competent plaintiffs' lawyers will surely file their actions in federal district courts, citing diversity for jurisdiction and demanding that the district courts follow the Ninth Circuit's interpretation of California law. As these cases will be filed in federal courts, they will not provide the California Supreme Court any opportunity to correct the majority's interpretation of California law.
 
 G
 
 32
 The final irony is that the panel's decision, its impact on California and manufacturers, and its infringement on principles of federalism, were avoidable. Pursuant to Rule 29.8(a) of the California Rules of Court, we could have, and should have, certified the issues of California law to the California Supreme Court.[5]
 
 
 33
 We last certified questions to the California Supreme Court in Kremen v. Cohen, 325 F.3d 1035, 1037-38 (9th Cir.2003). In that case, we certified questions related to Internet domain names and the tort of conversion. Id. We recognized that this procedure is "reserved for state law questions that present significant issues, including those with important public policy ramifications, and that have not yet been resolved by the state courts." Id. at 1037. We noted that certification would not be appropriate to avoid a difficult legal issue or to sidestep our diversity jurisdiction. Id. at 1038. We indicated that we were aware of the "burgeoning caseload of the California Supreme Court" and "would not presume to certify a run-of-the-mill case." Id. Rather, in a case "that raises a new and substantial issue of state law in an arena that will have broad application, the spirit of comity and federalism cause[d] us to seek certification." Id. Judge Kozinski, dissenting from the certification, urged that "[c]ertification is justified only when the state supreme court has provided no authoritative guidance, other courts are in serious disarray and the question cries out for a definitive ruling." Id. at 1044.
 
 
 34
 This case meets all these criteria. To the extent that Merrill is distinguishable, as the majority contends, the California Supreme Court has not provided authoritative guidance. The panel's opinion is likely to create disarray in federal and state courts in California. Furthermore, reflection on the potential consequences of the panel's position cries out for an initial determination by the California Supreme Court. Manufacturers are often the "deep pockets" when innocent people are killed or injured by the misuse or criminal use of dangerous products. The panel would allow manufacturers to be sued even though their products are not alleged to be defective and even though the actual perpetrator of the injury acted criminally, simply because the manufacturer allegedly sought to market more goods than the plaintiffs believe the market could safely handle.
 
 
 35
 Certification of this case is supported by our decision in Torres v. Goodyear Tire & Rubber Co. Inc., 867 F.2d 1234, 1239 (9th Cir.1989), certifying to the Arizona Supreme Court the question whether a trademark licensor is strictly liable for personal injuries caused by a defective product bearing its trademark. In Torres, we noted that "some courts have concluded that strict liability should attach to the trademark licensor as one within the `stream of commerce' in which the product flows." Id. at 1238. We listed seven cases, as well as commentators, supporting this proposition and listed no cases to the contrary. Id. Nonetheless, the court stated, "we hesitate prematurely to extend the law of products liability in the absence of an indication from the Arizona courts or the Arizona legislature that such an extension would be desirable." Id.
 
 
 36
 The discussion of strict liability in Torres also recommends certification in this case. We noted that the Restatement (Second) of Torts § 402A imposes strict liability on "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property." Id. at 1237 (editing in original). We further commented that under Arizona law, "[s]trict liability is a public policy device to spread the risk from one to whom a defective product may be a catastrophe, to those who marketed the product, profit from its sale, and have the know-how to remove its defects before placing it in the chain of distribution." Id. (citations and quotation marks omitted).
 
 
 37
 The majority of the panel in this case, contrary to Torres, rushes to extend the equivalent of strict liability to the manufacturer of a product that the plaintiffs admit was not defective. Accordingly, there is no way that the manufacturer could remove the "defects" before placing the item into the chain of distribution. The majority, undaunted, seeks to impose liability on a manufacturer because the manufacturer's otherwise legal marketing of a non-defective product allegedly encourages an "illegal gun market." Such a determination of a state's "public policy" should be made by the state's supreme court or its legislature, rather than imposed on a state by a federal court exercising diversity jurisdiction.
 
 
 38
 Finally, in declining to certify this case to the California Supreme Court, the court fails to heed the advice of the United States Supreme Court. In Arizonans for Official English v. Arizona, 520 U.S. 43, 75-80, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), the Supreme Court vacated our decision and chastised us for not using the certification process.
 
 
 39
 Blending abstention with certification, the Ninth Circuit found "no unique circumstances in this case militating in favor of certification." Novel, unsettled questions of state law, however, not "unique circumstances," are necessary before federal courts may avail themselves of state certification procedures. Those procedures do not entail the delays, expense, and procedural complexity that generally attend abstention decisions. Taking advantage of certification made available by a State may "greatly simplify" an ultimate adjudication in federal court.
 
 
 40
 520 U.S. at 79, 117 S.Ct. 1055 (citations, footnote and editing omitted).
 
 H
 
 41
 In sum, I dissent on two separate but related grounds from our decision not to take this case en banc. First, fundamental concepts of federalism, emphasized in Torres and Arizonans for Official English, required that we certify the questions of California law to the California Supreme Court. We should not reach out to create a state's "public policy" unless there is no alternative.
 
 
 42
 Second, the majority of the panel's creative interpretation of California law is wrong and will have a deleterious impact on California, manufacturers, and the federal and state courts in California. Common negligence concepts of duty and causation do not allow the unfortunate victims of the criminal use of a dangerous, but not defective, product to recover from the product's manufacturer simply because the manufacturer's marketing schemes allegedly promoted a secondary market that purportedly facilitated the illegal purchase of the product. California law does not support this imposition of the equivalent of strict liability.
 
 
 
 Notes:
 
 
 [1]
 Glock is the manufacturer of one of the guns that Furrow used to injure his victims. Glock is sometimes used as a shorthand reference to all the remaining defendants
 
 
 [2]
 Again, Judge Hall's dissent has the better perspective that this action is a products liability action barred by Cal. Civ.Code § 1714.4Ileto, 349 F.3d at 1218-20. However, the scope of the panel's opinion is enhanced by the fact that Cal. Civ.Code § 1714.4 has been repealed. Nonetheless, this does not mean that California law is as the panel opines. The repeal of Cal. Civ.Code § 1714.4 was intended to preserve causes of action as they would have existed had § 1714.4 not been enacted in 1983.
 
 
 [3]
 Unlike negligence, strict liability law has evolved past these barriers to liability. Early on, California decided to impose strict products liability on manufacturers and others in the chain of commerce, regardless of their proximity to the injured plaintiff, of moral blame, and of the other traditional negligence considerations mentioned above. The courts reasoned that the costs of compensation could more equitably be borne by the commercial classes than the injured plaintiffsSee, e.g., Vandermark v. Ford Motor Co., 61 Cal.2d 256, 262-63, 37 Cal.Rptr. 896, 391 P.2d 168 (1964) (holding that a manufacturer's and a retailer's liability should be imposed irrespective of fault); Greenman v. Yuba Power Prods. Inc., 59 Cal.2d 57, 63-64, 27 Cal.Rptr. 697, 377 P.2d 897 (1963) (holding a manufacturer's liability should be imposed irrespective of fault).
 
 
 [4]
 Although not decided at the time the panel issued its decision, the California Supreme Court's opinion inWiener v. Southcoast Childcare Centers, Inc., 32 Cal.4th 1138, 12 Cal.Rptr.3d 615, 88 P.3d 517 (2004), indicates that under California law Glock could not be held to have foreseen Furrow's criminal actions.
 In Wiener, Abrams deliberately drove his car through a four-foot-high chain-link fence that enclosed a child care facility's playground, killing two children and injuring several others. The parents of the deceased children sued the child care center alleging that the accident was foreseeable and that the chain-link fence provided inadequate protection. The California Supreme Court affirmed a grant of summary judgment for defendants. It reiterated that determining whether a duty exists involves the balancing of a number of considerations, citing Rowland. 32 Cal.4th at 1144-45, 12 Cal.Rptr.3d 615, 88 P.3d 517. The court went on to state that its cases "analyze third party criminal acts differently from ordinary negligence, and require us to apply a heightened sense of foreseeability before we can hold a defendant liable for the criminal acts of third parties." 32 Cal.4th at 1149-50, 12 Cal.Rptr.3d 615, 88 P.3d 517. This is because, (1) "it is difficult if not impossible in today's society to predict when a criminal might strike:" and (2) "if a criminal decides on a particular goal or victim, it is extremely difficult to remove his every means for achieving that goal." Id.
 
 
 [5]
 The en banc call in this case sought certification of the issues of California law to the California Supreme Court. There is precedent for certifying a question to a state supreme court after a three-judge panel has rendered an opinion. InParents Involved in Cmty. Sch. v. Seattle Sch. Dist., No. 1, 294 F.3d 1085, 1086 (9th Cir.2002), a three-judge panel heard argument and rendered a decision. Rehearing and rehearing en banc were sought. Id. The panel then withdrew its opinion, granted the petition for rehearing, and certified a question to the Washington Supreme Court, even though the parties at oral argument had unanimously requested that the court not certify the state law question to the Washington Supreme Court. Id.
 
 
 
 43
 KOZINSKI, Circuit Judge, with whom Judges O'SCANNLAIN, KLEINFELD, GOULD, CALLAHAN and BEA, join:
 
 
 44
 Imposing novel tort theories on economic activity significantly affects the risks of engaging in that activity, and thus alters the cost and availability of the activity within the forum jurisdiction. In effect, it is a form of regulation administered through the courts rather than the state's regulatory agencies. It is, moreover, a peculiarly blunt and capricious method of regulation, depending as it does on the vicissitudes of the legal system, which make results highly unpredictable in probability and magnitude. Courts should therefore be chary of adopting broad new theories of liability, lest they undermine the democratic process through which the people normally decide whether, and to what degree, activities should be fostered or discouraged within the state. This caution applies with particular force to federal courts, whose judges are not appointed through the state's political processes, and may not even live within the states affected by their decisions. For these reasons, and those aptly stated by Judge Callahan, I respectfully dissent from our court's failure to take this case en banc.